## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARK J. POLLARD,** | ) |
| **Petitioner,** | ) **Civil Action No. 07-259 Erie** |
| | ) |
| **v.** | ) |
| | ) **District Judge Sean J. McLaughlin** |
| **MARK KRYSEVIG, et al.,** | ) **Magistrate Judge Susan Paradise Baxter** |
| **Respondents.** | ) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus [Document
No. 1] be denied and that a certificate of appealability be denied.

### II.   REPORT

#### A.   Relevant Background[1]

In or around October 2001, Petitioner Mark J. Pollard was charged with several crimes
relating to the robbery that occurred at a home located at 108 Sobieski Street in Erie,
Pennsylvania.  Petitioner was tried before a jury on July 10-11, 2002.  Bruce G. Sandmeyer, Esq.,
was his attorney.

The Superior Court of Pennsylvania summarized the evidence submitted against him at
trial as follows:

> At approximately 4:30 p.m. on September 21, 2001, Mark Lupo was walking around
> his neighborhood ... and proceeded north on Sobieski Street, Erie, where he lives.
> Mr. Lupo heard glass break and then saw four men run from the porch of his house
> [at] 108 Sobieski Street.  Those men included [Petitioner], whom Mr. Lupo had
> known for ten years, two unidentified African-American males, and Matthew Fox,
> who was Mr. Lupo's friend.  Mr. Fox was being chased by the two unidentified males
> and was running behind [Petitioner].  [Petitioner] then turned ... and disappeared

---

[1]

Respondents have submitted the original state court record ("SCR").  It is indexed and consists of 47 documents.  It
shall be cited to as "SCR No. __ ."

[from view]. Mr. Lupo was positive in his identification of [Petitioner] as one of the men who [had run] from the porch..., stating that approximately five minutes before the incident he saw [Petitioner] driving down Second Street with the two unidentified men in his car.

Gary Lindsey also lived at 108 Sobieski Street on September 21, 2001. According to Mr. Lindsey's testimony at [Petitioner's] jury trial, at approximately 4:00 p.m., [Petitioner] arrived at Mr. Lindsey's residence with two unidentified males and asked for Mark Rumbaugh, a friend and frequent visitor of Mr. Lindsey. Mr. Lindsey told [Petitioner] that Mr. Rumbaugh was not there, and [Petitioner] called him a "liar." N.T. Jury Trial-Day 1, 7/10/02, at 38. By that point, Mr. Fox, who had been in another room in the house, came to the door and repeated that Mr. Rumbaugh was not present. [Petitioner] stated to his companion, "Show them what we have, show them what we got." Id. at 46. At that point, one of the two men with [Petitioner] lifted up his shirt and displayed a gun contained in his waistband. Fearful, Mr. Lindsey turned away as the man started to reach for the gun. As he was turning away, he saw "out of the corner of [his] eye" [Petitioner] take a chain from Mr. Fox's neck. Id. at 40. Mr. Lindsey turned back and saw Mr. Fox start to run. Mr. Lindsey went outside to follow Mr. Fox, who was being chased by [Petitioner's] two cohorts. Mr. Lindsey then observed the man who [had] displayed the gun hit Mr. Fox on the back of the head with it.

Mr. Fox testified that he also lived at 108 Sobieski Street and had known [Petitioner] for approximately two weeks prior to the incident. Between 4:00 p.m. and 4:30 p.m. on September 21, 2001, Mr. Fox was working on a computer when he heard a knock on his door. Mr. Lindsey opened the door and started to speak with someone. Mr. Fox went to the door to investigate and saw [Petitioner] with two men whom he did not know talking to Mr. Lindsey. Mr. Fox decided to open the door fully, and [Petitioner] asked for Mr. Rumbaugh. When Mr. Fox told him that Mr. Rumbaugh was not at home, [Petitioner] said, "[D]on't lie to me, why you lying to me." Id. at 53. Mr. Fox retorted that he was not lying and insisted that Mr. Rumbaugh was at work. Then, [Petitioner] "turned to his friend and said, 'Show him what we have.[']" Id. at 54. In response, one of the men pulled a gun from his pants and "waved it." Id. [Petitioner] suddenly grabbed a $1,000 gold chain that Mr. Fox was wearing, tearing it from his neck. Since the man "was still standing there with the gun," Mr. Fox was stunned. Id. at 56. He decided to chase [Petitioner] who already had started down the steps. Mr. Fox proceeded in between [Petitioner's] cohorts and started to run after [Petitioner]. The two unidentified males followed behind Mr. Fox, who became aware that he was being chased and was "struck on the side of the head with the gun" as he turned around to look. Id. at 56.

(SCR No. 33, Commonwealth v. Pollard, No. 1851 WDA 2003, slip op. at 1-3 (Pa. Super. July 27, 2004) ("Pollard 1")). Based on this evidence, the jury found Petitioner guilty of one count each of robbery, conspiracy to commit robbery, and receiving stolen property, and two counts of terroristic threats.

The trial court sentenced Petitioner on August 28, 2002. It imposed the following consecutive terms of imprisonment: Count 1 (Conspiracy) – three to six years; and, Count 2 (Robbery) – five to ten years. Thus, the total aggregate prison sentence was eight to sixteen

years' incarceration (to be followed by ten years' probation for Counts 4 and 5 (Terroristic

Threats)).  (See Sentencing Hr'g Tr. at 14-15).  All of the sentences imposed were well within the

statutory maximums.  At Count 2 (Robbery), the court applied the sentencing enhancement

codified at 42 PA.CONS.STAT. § 9712, which imposes a minimum period of incarceration of five

years on a defendant who visibly possesses a firearm during the commission of a crime of

violence.  Section 9712 was applied even though Petitioner had not possessed a firearm because

at the time of his sentencing the controlling authority issued by the Superior Court of

Pennsylvania was clear that "an unarmed accomplice to a crime mandating imposition of a

sentence under § 9712 ... shall be sentenced in accordance thereof if it is shown by the proof that

the unarmed accomplice had knowledge that the firearm was visibly possessed by his co-felon in

the commission of the crime."  Commonwealth v. Matos, 555 A.2d 901, 902-03 (Pa. Super.

1989).  Accord Commonwealth v. Walker, 562 A.2d 373 (Pa. Super. 1989); Commonwealth v.

Williams, 509 A.2d 1292 (Pa. Super. 1986); Commonwealth v. Grimmitt, 512 A.2d 43 (Pa.

Super. 1986).

William J. Hathaway represented Petitioner in his direct appeal.  Petitioner, through

Hathaway, raised the following relevant claim to the Superior Court:

> The lower court erred in applying the deadly weapon enhancement for purposes of
> the mandatory minimum sentence in that there was an insufficient predicate for
> the application by the court.  The appellant constituted an unarmed accomplice
> and there was lacking any credible proof that the appellant had actual or
> constructive knowledge of his co-defendant's possession of a firearm.  The
> appellant did not have a firearm on his person or within his immediate physical
> control during the course of the criminal episode.

*Brief For Appellant*, Commonwealth v. Pollard, No. 1851 WDA 2003, 2003 WL 23648205 (Pa.

Super. Feb. 3, 2004).

On July 27, 2004, the Superior Court issued a Memorandum affirming the judgment of

sentence.  It held:

> In the present case, the evidence at trial established that [Petitioner] knew
> that one of his unidentified companions was in possession of a firearm.  First,
> [Petitioner] urged that companion to display the weapon.  Second, the man was
> waving it around just before [Petitioner] took Mr. Fox's necklace.  The record
> therefore supports the sentencing court's application of 42 Pa.C.S. § 9712(a) under
> the cited case law.

(SCR No. 33, <u>Pollard 1</u>, No. 1851 WDA 2003, slip op. at 7-8).

On January 10, 2005, the Pennsylvania Supreme Court denied Petitioner's request for allocatur.[2]  (SCR No. 32).  His judgment of sentence became final 90 days later – on or around April 11, 2005 – the last date upon which he could have filed a timely petition for certiorari with the United States Supreme Court.

On October 19, 2005, Petitioner filed a *pro se* motion under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA.CONS.STAT. § 9541 *et seq*., in which he raised the following relevant claims, which are the same claims that he raises in the instant federal habeas petition:

<blockquote>

Claim 1   Appellate counsel on his direct appeal (Hathaway) was ineffective in failing to argue that the sentencing court *violated his due process rights* by imposing a mandatory minimum sentence under 42 PA.CONS.STAT. § 9712 based on a finding by a mere preponderance of the evidence that he had knowledge of his co-conspirator's possession of a firearm during the commission of the offense.

Claim 2   Trial counsel (Sandmeyer) was ineffective for failing to object to inadmissible hearsay statements by prosecution witness Matthew Fox during trial, and for failing to request a curative instruction;

Claim 3   Trial counsel (Sandmeyer) was ineffective in failing to object, request an immediate curative instruction, and have stricken from the record certain statements made by the prosecutor in her closing argument concerning Petitioner's failure to testify in his defense.

</blockquote>

(SCR Nos. 34-35).

The PCRA Court appointed Vincent Nudi, Esq., to represent Petitioner and he subsequently filed a "no merit" letter and a request to withdraw.  On March 21, 2006, the PCRA Court issued a notice of intent to dismiss the petition without a hearing and an attached opinion

---

[2]

A little more than two years later, and well after Petitioner's judgment of sentence became final, the Pennsylvania Supreme Court issued <u>Commonwealth v. Dickson</u>, 918 A.2d 95 (Pa. Mar. 9, 2007).  In <u>Dickson</u>, the Pennsylvania Supreme Court overruled the cases that the Superior Court had relied upon in denying Petitioner's direct appeal challenge to the application of § 9712 at his sentencing.  The Pennsylvania Supreme Court held that the language of § 9712 was unambiguous and that "unarmed co-conspirators do not fall within" that statute's ambit.  <u>Dickson</u>, 918 A.2d at 387.  As of this date, neither the Pennsylvania Supreme Court nor the Superior Court has held that <u>Dickson</u> applies retroactively to cases that were final before its issuance.

setting forth the court's reasoning.  (SCR No. 40).  Petitioner filed a *pro se* response.  (SCR No. 41).  Thereafter, the PCRA Court issued an order dismissing the petition.  (SCR No. 42).

On June 12, 2007, the Superior Court issued a Memorandum affirming the denial of PCRA relief.  (SCR No. 47, Commonwealth v. Pollard, No. 862 WDA 2006, slip op. (Pa. Super. June 12, 2007) ("Pollard 2")).  It denied each of Petitioner's aforementioned claims on the merits for reasons that will be discussed in more detail below.

Next, Petitioner filed with this Court a *pro se* Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254, in which he raises the same three claims that he raised in his PCRA proceeding. [See *Petition*, Document No. 1, and *Brief In Support*, Document No. 4]. Respondents have filed their Answer[3] [Document No. 9] and all relevant state court records.

### B.       Discussion

### Standard Of Review

Because the Superior Court rejected Petitioner's claims on the merits, this Court's review of those claims is circumscribed by the standard enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which is codified at 28 U.S.C. § 2254(d).  AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  It provides, in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

---

[3] Respondents inexplicably have failed to address the allegations that Petitioner makes in Claim 2 and Claim 3.  The bulk of their Response contains rote language regarding matters such as statute of limitations, exhaustion, and procedural default – which they acknowledge are not at issue in this proceeding.  In the future, greater care must be given to answering the actual claims and issues presented by the habeas petition.

28 U.S.C. § 2254(d)(1).  See also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert v.
Blackwell, 387 F.3d 210, 234 (3d Cir. 2004); Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004);
Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze
Petitioner's claims of ineffective assistance of appellate and trial counsel is set forth in Strickland
v. Washington, 466 U.S. 668 (1984).[4]  Under Strickland, Petitioner must show that counsels'
"representation fell below an objective standard of reasonableness."  466 U.S. at 688; see also
Williams, 529 U.S. at 390-91.  "A fair assessment of attorney performance requires that every
effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of
counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."
Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689).
"However, [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a
strong presumption that counsel's conduct falls within the wide range of professional assistance;
that is, the defendant must overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy."  Id. (quoting Strickland, 466 U.S. at
689).  "[I]t is only the rare claim of ineffective assistance of counsel that should succeed under
the properly deferential standard to be applied in scrutinizing counsel's performance."  United
States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

Petitioner also must show under Strickland that he was prejudiced by his counsels'
alleged deficient performance.  This requires Petitioner to "show that there is a reasonable
probability that, but for counsel's unprofessional errors, the result of the proceeding would have
been different.  A reasonable probability is a probability sufficient to undermine confidence in
the outcome."  Strickland, 466 U.S. at 694.

The Superior Court applied the correct legal standard to Petitioner's ineffective assistance

---

[4]

Petitioner admits that AEDPA's standard of review applies and he candidly acknowledges that this standard adds
another hurdle in addition to the already heavy burden he faces under Strickland.  See also Knowles v. Mirzayance, —
U.S. — ,129 S.Ct. 1411, 1420 (2009) (noting "the doubly deferential judicial review that applies to a Strickland claim
evaluated under the § 2254(d)(1) standard.").

of counsel claims.  (SCR No. 47, Pollard 2, No. 862 WDA 2006, slip op. at 5-6; see also

Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999) (the legal standard for evaluating

ineffective assistance claims in a PCRA proceeding is the same as the federal Strickland

standard)).  Therefore, the Superior Court's adjudication of Petitioner's claims was not "contrary

to" Strickland.  Werts, 228 F.3d at 202-04 ("[A] state court decision that applied the

Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted

Strickland and thus was not 'contrary to' established Supreme Court precedent.").

        The only remaining question for this Court is whether the Superior Court's adjudication

of any of Petitioner's claims was an "unreasonable application" of Strickland.  To prevail under

this standard of review, Petitioner must demonstrate that the Superior Court's adjudication

"cannot reasonably be justified under existing Supreme Court precedent."  Hackett, 381 F.3d at

287; Knowles, 129 S.Ct. at 1420 (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The

question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable – a substantially higher threshold"));

Waddington v. Sarausad, — U.S. — , 129 S.Ct. 823, 831 (2009) (where it is the state court's

application of governing federal law that is challenged, "the state court's decision must be shown

to be not only erroneous, but objectively unreasonable.") (internal citations and quotations

omitted).

        For the reasons set forth below, Petitioner has not shown that the Superior Court's

adjudication of any his claims was an unreasonable application of Strickland.

### Claim 1

        Petitioner contends that Hathaway was ineffective for failing to contest on direct appeal

the *constitutionality* of the application of § 9712 in his sentencing.  As set forth *infra*, Hathaway

had argued to the Superior Court that Petitioner should not have been subject to the mandatory

minimum sentence set forth at § 9712 because there was no credible proof that he had actual or

constructive knowledge that his accomplice had a firearm, and also because the firearm was not

in his possession nor within his immediate physical control during the course of the robbery.

Hathaway, however, did not contend that the application of § 9712 was an error of constitutional

proportion, and in Claim 1 Petitioner contends that he should have.  Specifically, Petitioner

asserts that Hathaway was ineffective for failing to argue that the application of § 9712 violated

the Supreme Court's pronouncement in  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), that:

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond

the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

doubt."

In rejecting this claim, the Superior Court held that there was no merit to Petitioner's

argument that his constitutional rights were violated by the application of § 9712 since the

imposition of the minimum sentence did not exceed the statutory maximum[5] authorized by the

jury's verdict and therefore Apprendi and its progeny Blakey v. Washington, 542 U.S. 296 (2004)

were not offended.[6]  See also Commonwealth v. Kleinicke, 895 A.2d 562 (Pa. Super. 2006).

Because appellate counsel cannot be deemed ineffective for failing to pursue a meritless issue,

the Superior Court rejected Petitioner's claim that Hathaway's performance was constitutionally

deficient.  (SCR No. 47, Pollard, No. 862 WDA 2006, slip op. at 6-8).

There is no basis under AEDPA to disturb the Superior Court's adjudication.  It does not

grant relief on the type of constitutional claim that Petitioner contends Hathaway should have

raised.  See, e.g., Commonwealth v. Mitchell, 883 A.2d 1096 (Pa. Super. 2005) (no right to jury

trial for five year minimum mandatory sentence under § 9712 based on finding that defendant

visibly possessed a firearm); see also Kleinicke, supra.  Thus, if Hathaway had challenged the

application of § 9712 on constitutional grounds, that claim would have been denied.  Since

Hathaway cannot be faulted for omitting a meritless issue on appeal, the Superior Court's

---

[5]

The statutory maximum for robbery in this case was 20 years' imprisonment.  (SCR No. 40 at 12 (citing 18
PA.CONS.STAT. § 1103(1)).  The statutory maximum for conspiracy to commit robbery is also 20 years.  (Id.)  Thus,
Petitioner's five to ten year term of imprisonment was within the statutory maximum.

[6]

In Blakely, the Supreme Court held that that the "statutory maximum" for Apprendi purposes is the maximum
sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.
542 U.S. at 303.  In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose
after finding additional facts, but the maximum she may impose without any additional findings.  Id.

decision was not an unreasonable application of Strickland.  See, e.g., Johnson v. Tennis, 549

F.3d 296, 302 (3d Cir. 2008).  In addition, Petitioner cannot show that he was prejudiced because

he cannot establish that, but for Hathaway's alleged ineffectiveness, there is a reasonable

probability that he would have received relief on direct appeal.

### Claim 2

In his next claim, Petitioner argues that his trial attorney, Sandmeyer, was ineffective for

eliciting alleged hearsay statements from prosecution witness Matthew Fox during cross-

examination, and for failing to request a curative instruction.  In response to a question asked by

Sandmeyer, Fox stated that he had recognized one of the accomplices as Petitioner's brother-in-

law, based upon what he had been previously told.[7]  Petitioner contends that Fox's identification

of his brother-in-law was inadmissible hearsay.  He argues that he was prejudiced by Fox's

testimony because the jury would have believed that it was more likely than not that he had

criminally conspired with the two otherwise unidentified males accompanying him on the day of

the incident if the jury had accepted as true testimony that one of those individuals was related to

him.

In rejecting this claim, the Superior Court held that (without determining the "highly

debatable point that Mr. Fox's had uttered inadmissible hearsay") Petitioner could not show that

he was prejudiced because "the evidence of [his] participation in a criminal conspiracy is so

---

[7]
This claim is regarding the following exchange during Fox's cross-examination:

| | |
|---|---|
| Sandmeyer: | You describe some two African American males were on the steps on September 21st, correct? |
| Fox: | Yes. |
| Sandmeyer: | Had you ever seen those seen those two individuals before? |
| Fox: | One of them I did, yes. |
| Sandmeyer: | Where had you seen that individual? |
| Fox: | With [Petitioner].  The other time that [Petitioner] came to the door looking for Matt he was with him.  The one with the gun I've never seen before until that day. The other one, I seen him. |
| Sandmeyer: | Okay.  And did you know who that individual was? |
| Fox: | I wasn't sure about it, *but I was told that it was like his brother-in-law, married to his sister.  His name was Will.  That's just what I heard.* |

(N.T., Day 1 at 61 (emphasis added)).

overwhelming as to make" Sandmeyer's alleged ineffectiveness "regarding Mr. Fox's remarks completely harmless." (SCR No. 47, Pollard 2, No. 862 WDA 2006, slip op. at 9-10). The Superior Court's adjudication easily withstands AEDPA's standard of review. It cannot be said that there is a reasonable probability that the jury would not have convicted him of conspiracy to commit robbery but for Fox's testimony that he had heard that one of Petitioner's accomplices was his brother-in-law. The Commonwealth introduced sufficient evidence to establish the existence of a conspiracy,[8] and the testimony of Fox at issue in this claim was inconsequential to that conviction.

### Claim 3

In his final claim, Petitioner contends that Sandmeyer was ineffective for failing to object to the following remarks made by the prosecutor in her closing argument, which he contends improperly referenced the fact that he had exercised his right not to testify:

> Mr. Sandmeyer also indicates to you or tries to convince you that maybe not everybody testified that should have or could have. Well as you saw today, Mr. Sandmeyer presented witnesses as well in the form of Miss [Lisa Marie] Dacus.[9]

---

[8]

In addressing on direct appeal Petitioner's claim that there was insufficient evidence to support a verdict of conspiracy, the Superior Court held:

> In the present case, the evidence establishes that there was a constant association among [Petitioner] and the two co-conspirators. They were viewed driving together just prior to the crime, they approached the front door of 108 Sobieski Street together, and they fled together. Indeed, one of [Petitioner's] two companions aided [Petitioner] during the flight by striking Mr. Fox on the head with a gun. [Petitioner] knew about the commission of the crime since he was actively involved in it, he asked his companion to display a gun, and then actually stole the chain from Mr. Fox.
>
> We do not view as relevant the fact that the three men originally approached the house in search of Mr. Rumbaugh. The fact remains that [Petitioner] asked for his cohort to display the weapon and then took Mr. Fox's necklace. As noted, rarely is there direct evidence of an actual agreement; however, conspiracy will be found if a defendant intended to commit the crime along with his co-conspirator. Here, the evidence supports the finding that [Petitioner] directed his confederate to show the gun to Mr. Fox in order to further the robbery. Hence, we find the evidence was sufficient to support the jury's conclusion that [Petitioner] engaged in a conspiracy.

(SCR No. 33, Pollard 1, No. 1851 WDA 2003, slip op. at 6-7).

[9]

Dacus was the only witness presented by the defense. She testified that that she had observed two African American males approach Petitioner on a basketball court early in the afternoon on the day of the crimes. She stated that they

(continued...)

He had the option with other people.  And if there would be any inconsistencies with our missing witnesses, or who he's telling you are missing, given the fact that he not only did have Miss Dacus testify, I would suggest that not only absent witnesses are the fault of the Commonwealth.

(N.T., Day 2 at 34).

The Superior Court denied this claim because it determined that the prosecutor was not commenting on Petitioner's right to remain silent, and therefore there was no basis for Sandmeyer to object.  (SCR No. 47, Pollard 2, No. 862 WDA 2006, slip op. 10-11).  A review of the trial transcript supports the Superior Court's conclusion and no habeas relief is warranted under AEDPA.

During his closing argument, Sandmeyer highlighted inconsistencies in the testimony given by the prosecution witnesses.  (N.T., Day 2 at 20-29).  He then questioned why the prosecution failed to call Mark Lupo's father as a witness, since he was living at the home at 108 Sobieski Street and apparently was sitting in the living room when Petitioner and his accomplices came to the door.  (See N.T., Day 1 at 29-30, 44-45).  When considered in context, a fair reading of the prosecutor's subsequent challenged remarks supports the conclusion that she was responding to Sandmeyer's criticism that the prosecution did not call as a witness Lupo's father, and she was in turn suggesting that if the father could have provided the defense with any helpful testimony, Sandmeyer would have called him to support the defense case.  Thus, Petitioner's contention that the prosecutor impermissibly commented on his failure to testify is without merit, and there was no basis for Sandmeyer to object.  Moreover, Petitioner has not shown that he was prejudiced by Sandmeyer's failure to do so.

## C.    Certificate of Appealability

28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate

---

[9](...continued)
started kicking him. (N.T., Day 2 at 14-15).  In his closing argument, Sandmeyer referenced Dacus's testimony when he asked the jury to consider  whether "an individual [would] get into a fight with two people and then go off with them and commit a robbery or whatever was being done that day[?]"  (Id. at 20; see also id. at 21 ("[A]sk yourself, would [Petitioner then willingly go with these people and be the leader of an endeavor[?]").

review of a district court's disposition of a habeas petition.  It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]"  Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  Applying this standard here, jurists of reason would not find it debatable whether Petitioner's claims are without merit.  Accordingly, a certificate of appealability should be denied.

## III.     CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, Petitioner is allowed to file objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to file timely objections may constitute a waiver of any appellate rights.  See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated:  April 21, 2010

cc:     The Honorable Sean J. McLaughlin
        United States District Judge